## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | | |
|---|---|---|
| In re: | ) | Case No.   12-29466 |
| | ) | |
| Patricia Jepson | ) | Chapter 7 |
| Debtors. | ) | Judge: Timothy A. Barnes |

_____

| | | |
|---|---|---|
| | ) | |
| Patricia Jepson, | ) | |
| Plaintiff, | ) | |
| v. | ) | Adv. No. 12-01660 |
| Bank of New York Mellon f'/k/a | ) | |
| The Bank of New York, as Trustee | ) | |
| for CWABS, Inc., Asset-Backed | ) | |
| Certificates, Series 2006-1 | ) | |
| Defendant. | ) | |

### PLAINTIFF'S RESPONSE TO DEFENDANT'S MOTION TO DISMISS PLAINTIFF'S ADVERSARY COMPLAINT

NOW COMES plaintiff Patricia Jepson (plaintiff) by and through her attorney, Kenneth

E. Kaiser, and for plaintiff's response to defendant Bank of New York Mellon f'/k/a The Bank of

New York, as Trustee for CWABS, Inc., Asset-Backed Certificates, Series 2006-1's (Trust)

Motion to Dismiss Plaintiff's Adversary Complaint and accompanying Memorandum of Law,

states as follows:

### THE TRUST DOES NOT HAVE STANDING

Plaintiff has made a "factual challenge" to defendant's standing by introducing evidence

namely, the Pooling and Servicing Agreement (PSA) to show that, contrary to defendant's

allegations, defendant lacks standing. See *Apex Digital, Inc. v. Sears Roebuck & Co.* (7th Cir.

2009), 572 F.3d 440. A "factual challenge" lies where the contention is that there is in fact no

subject matter jurisdiction, *Apex Digital.* To overcome a factual challenge to standing, the

defendant must come forward with "competent proof" that standing exists, *Apex Digital*. The 7th

Circuit Court of Appeals has interpreted "competent proof" as requiring a showing by a preponderance of the evidence, or proof to a reasonable probability that standing exists, *Retired Chicago Police Ass'n v. City of Chicago* (7th Cir. 1994), 76 F.3d. 856.

Defendant does not have standing if it cannot prove that it owned the note and mortgage in the instant case (Note) and (Mortgage) on the date the foreclosure complaint was filed, *Deutsche Bank National Trust Co. v. Steele* (S.D. Ohio, Jan. 8, 2008), 2008 WL 111227.

In its motion to dismiss defendant argues that plaintiff lacks standing to bring any claims which are premised on an alleged failure to comply with the terms of the PSA because plaintiff is neither a party to, nor a third party beneficiary of, the PSA.

Defendant cites a number of cases which stand for this principal including *Bank of America, National Association v. Bassman FBT, L.L.C., et al.*, (2012 2nd dist.), 2012 Il App (2d) 110729, 2012 Ill. App. Lexis 487, 981 N.E.2d 1,366 Ill. Dec. 936, which is the most instructive.

In all of these cases, the borrower was held not to have standing to contest the trust's standing, because it was not a party to the pooling agreement. However, if the assignments of the Note and Mortgage to the trustee are void *ab initio* under New York law because they do not comply with the PSA, then the borrower has standing to contest the trust's standing to foreclose and the trust does not have standing to foreclose.

In. *Bassman* there were transfers of the note and mortgage that did not conform to the requirements of the pooling agreement forming the trust just as in the instant case. In *Bassman* the court concluded that New York Law was applicable to interpreting the effect of failing to assign the note and mortgage to the trust pursuant to the terms of the pooling agreement. As in this case, the plaintiff and defendant both argue that the other does not have standing. In *Bassman* the court framed the dispute as follows:

2

"Each party contends that the other lacks standing. Defendants argue that the mortgages were not properly transferred to the trust in the manner specified by the PSA. According to defendants, that the PSA was violated means that plaintiff does not have good title to the mortgages and that they are not part of the trust. Therefore, defendants reason, plaintiff is attempting to assert an interest it does not own. Plaintiff responds that the mortgages were, in fact, transferred to the trust. Even if the manner in which they were transferred did not comply with the PSA, it does not follow that they are not part of the trust. Moreover, since defendants are not parties to the PSA, defendants lack standing to rely upon its provisions."

In *Bassman*, the court determined that if the assignment of the note and mortgage to the PSA was made in a manner other than the manner required by the PSA, the assignment is either void or voidable under New York law. If the assignment is void under New York law then the Trust is not the owner and has no standing. If the assignment is merely voidable the borrower, who is not a party to the assignment or the PSA, has no standing to complain about the assignment.

The *Bassman* court relied on *Livonia Property Holdings, L.L.C. v. 12840-12976 Farmington Road Holdings, L.L.C.* (E.D. Mich. 2010) 717 F. Supp. 2d 724, which relied on section 132 of Corpus Juris Secundum *Assignments* (2004) to reach that conclusion, when it stated as follows:

"A debtor may, generally, assert against an assignee all equities or defenses existing against the assignor prior to notice of the assignment, any matters rendering the assignment absolutely invalid or ineffective, and the lack of the plaintiff's title or right to sue; but, if the assignment is effective to pass legal title, the debtor cannot interpose defects or objections which merely render the assignment voidable at the election of the assignor or those standing in his or her shoes." 6A C.J.S. *Assignments* § 132 (2004)." Hence, this appeal turns on whether noncompliance with the PSA rendered the assignment of the mortgages void or voidable."

In *Bassman*, the court recites New York's statute on Estate Powers and Trust Law § 7-2.4, which states as follows:

"If the trust is expressed in the instrument creating the estate of the trustee, every sale, conveyance or other act of the trustee in contravention of the trust, except as authorized

by this article and by any other provision of law, is void." N.Y. Est. Powers & Trusts Law § 7-2.4 (McKinney 1998)."

The court in *Bassman* cited no cases involving an assignment of a note and mortgage to a commercial trust formed with a pooling and servicing agreement having thousands of certificate-holders (beneficiaries) such as the trust in *Bassman* or the Trust in the instant case. There were no New York cases directly on point when Bassman was decided. Bassman cited cases that held that any ultra-vires action by the Trustee is void. *Bassman* also cited cases similar to *Mooney v. Madden* (1993) 193 A.D.2d 933, where a beneficiary of a testamentary trust sued the trustees for voting shares of stock held by the trust in a manner not allowed by the trust. The court held that if **all** of the beneficiaries agree to ratify the trustee's ultra-vires actions the trustee may bind the trust to an otherwise invalid act or agreement, which is outside the scope of the trustee's power and not be liable to any beneficiary.

Based on these cases the *Bassman* court decided that if a trustee's ultra-vires actions could be ratified by all beneficiaries and made legitimate, the Trustee's ultra-vires acts are voidable under New York law and not void. Many of the cases cited in *Bassman* are not actions involving trusts at all. The cases involving trusts are suits between the beneficiaries and the trustee and none of these trusts are commercial trusts with thousands of beneficiaries like the trust in *Bassman* or the instant case. In some of the cases cited in *Bassman* the court held that the beneficiary consented to the trustee's act by accepting the increased benefit to the beneficiary from the trustee's ultra-vires act and now cannot sue the trustee for taking the action.

Under New York law, the trustee of a commercial trust similar to the trustee in the PSA is a fiduciary of the trust, but the trustee has only the power to act on behalf of the trust and bind the trust as is enumerated in the trust indenture, the PSA in the instant case. The court in the

case of *In re E.F. Hutton Southwest Properties II v. Union Planters* (5th Cir. 1992), 953 F.2d

963, stated as follows:

> "the corporate trustee has very little in common with the ordinary trustee. . . . The trustee
> under a corporate indenture . . . has his rights and duties defined, not by the fiduciary
> relationship, but exclusively by the terms of the agreement. His status is more that of a
> stakeholder than one of a trustee."

New York courts have held that New York common law governing trust indentures is consistent

with the foregoing interpretations and federal courts applying New York law have ruled

similarly. See *AG Capital Funding Partners, L.P. v. State Street Bank and Trust Co.* ( 2008), 11

N.Y.3d 146; *Elliott Associates v. J. Henry Schroder Bank & Trust Co.* (2d Cir. 1988), 838 F.2d

66, 71. The court in *Semi-Tech Litigation, LLC v. Bankers Trust Co.* (S.D.N.Y. 2005), 353 F.

Supp. 2d 460, for instance, stated as follows:

> "[u]nder New York law, the pre-default duties of an indenture trustee . . . generally are
> limited to the duties imposed by the indenture. After an event of default, the trustee is
> held to the prudent man standard."

## ACCORDING TO  SALDIVAR, UNDER EROBOBO, THE TRUSTEES ULTRA-VIRES ACTS ARE VOID UNDER NEW YORK LAW

*Saldivar v. JP Morgan Chase Bank, N.A.*  case number 11-10689, adversary number 12-

01010 memorandum opinion deciding Chase Bank's motion to dismiss in the United States

Bankruptcy Court for the Southern District of Texas Brownsville Division was just decided on

June 5, 2013. A copy of the memorandum opinion is attached hereto as Exhibit A, incorporated

herein by reference and made a part hereof.

*Saldivar* involved a commercial REMIC trust governed by a pooling and servicing

agreement similar to the Trust in the instant case. The trustee accepted assignments of the note

and mortgage after the closing date in the PSA and in a manner not allowed under the PSA. In

*Saldivar* the court stated as follows:

"The *Bassman* court cites New York cases that hold that beneficiaries of a trust can ratify a trustee's *ultra vires* acts. *See Gregan v. Buchanan, et al*, 37 N.Y.S. 83, 85 (N.Y. Sup. Ct. 1896); *see also Hine v. Huntington, et al.* 103 N.Y.S. 535, 540 (N.Y. App. Div. 1907); *Birnbaum v. Birnbaum, et al.*, 503 N.Y.S.2d 451 (N.Y. App. Div. 1986). The *Bassman* court holds that the ability to ratify a trustee's *ultra vires* act is equivalent to finding that a trustee's *ultra vires* act is merely voidable and not void.

Under 28 U.S.C. § 1652, this Court has the duty to apply New York law in accordance with the controlling decision of the highest state court. *Royal Bank of Canada v. Trentham Comm.,* 665 F.2d 515, 516 (5th Cir. 1981). While the Court finds no applicable New York Court of Appeals decision, a recent New York Supreme Court decision is factually similar to the case before the Court. *See Wells Fargo Bank, N.A. v. Erobobo, et al.,* 2013 WL 1831799 (N.Y. Sup. Ct. April 29, 2013). In *Erobobo,* defendants argued that plaintiff (a REMIC trust) was not the owner of the note because plaintiff obtained the note and mortgage after the trust had closed in violation of the terms of the PSA governing the trust, rendering plaintiffs acquisition of the note void. *Id.* at *2. The *Erobobo* court held that under § 7-2.4, any conveyance in contravention of the PSA is void; this meant that acceptance of the note and mortgage by the trustee after the date the trust closed rendered the transfer void. *Id.* at 8.

Based on the *Erobobo* decision and the plain language of N.Y. Est. Powers & Trusts Law § 7-2.4, the Court finds that under New York law, assignment of the Saldivars' Note after the start up day is void *ab initio.* As such, none of the Saldivars' claims will be dismissed for lack of standing. The Court expresses no view on the effect of any subsequent ratification, if any. It is sufficient that a claim has been stated.

The Saldivars have pled facts sufficient to withstand dismissal on whether the transfer to the Trust was void *ab initio.* The Saldivars allege that assignment occurred in 2011—several years after the startup day. If this proves true, Chase may not be the owner of the Note."

*Royal Bank of Canada* cites the United States Supreme Court case *Vandenbark v. Owens-Illinois Glass Co*. (1941) 311 U.S. 538 which states as follows:

"the duty rests upon federal courts to apply state law under the Rules of Decision statute in accordance with the then controlling decision of the highest state court."

Since *Erobobo* was decided April 29, 2013, that decision is the law in New York.

Assignments of notes and mortgages and note endorsements not made in accordance with the

pooling and servicing agreements or after the closing date are void *ab initio. T*he *Erobobo*

decision is attached hereto as Exhibit B, incorporated herein by reference and made a part hereof.

The Appellate Court in California, Fifth District just decided *Glaski v. Bank of America* (2013),

No. FO64556, determining that assignments and endorsements that do not comply with the pooling agreement are void under New York law citing *Erobobo.* The *Glaski* opinion is attached hereto as Exhibit C, incorporated herein by reference, and made a part hereof.

Some cases have found that the endorsement or assignment of the note that does not comply with the PSA is only voidable and not void under New York Trust Law, even though the trust statute explicitly states that it is void and the decision of the highest court of New York deciding the issue in *Erobobo* stated such an assignment is void.

Some of those courts said they did so to protect the beneficiaries of the trust who might not be able to collect their share of the proceeds on a foreclosure sale if they found otherwise.

A much more serious loss to the beneficiaries of the trust would be the loss of the trust's REMIC status under the Internal Revenue Code for the trusts failure to comply with the Code. The effect of that would be that all of the trusts income would be taxed twice during the entire life of the trust, resulting in hundreds of millions of dollars of additional tax. Without the REMIC status the trust would be taxed once at the trust level and the beneficiaries would be taxed again upon their annual distribution from the Trust. With the REMIC status the Trust is not taxed and the beneficiaries are taxed upon their distributions.

The whole purpose of forming the Trust was to create a REMIC so the beneficiaries could avoid double taxation. In many cases the return derived from the ownership of the mortgages alone would not be enough to attract the beneficiaries of the Trust to invest in the Trust, if the Trust income is taxed twice for the life of the Trust. That is why the PSA is so explicit about the Trustee not taking any action to destroy the Trust's REMIC status and why the Trust describes in great detail in Section 2.01(g)(i) on page 58

7

of the PSA how the Note and Mortgage are to be negotiated to the Trust before the

Closing Date of the Trust in the manner required to preserve the REMIC status of the

Trust.

In *Glaski* the court recognized the necessity of the trust preserving the REMIC status

when it stated as follows:

> "We believe applying the statute to void the attempted transfer is justified because it
> protects the beneficiaries of the WaMu Securitized Trust from the potential adverse tax
> consequence of the trust losing its status as a REMIC trust under the Internal Revenue
> Code."

The *Erobobo* court also recognized the necessity of preserving the REMIC status of the

trust when it stated as follows:

> "Since the Trustee acquired the subject note and mortgage after the closing date, the
> trustee's act in acquiring them exceeded its authority and violated the terms of the trust.
> The acquisition of a mortgage after 90 days is not a mere technicality but a material
> violation of the trust's terms, which jeopardizes the trust's REMIC status.
>
> Section 9.01(f) of the PSA provides that neither the Trustee, the Servicer or Holder of the
> Certificates shall cause any REMIC formed under the PSA, by action or omission, to
> endanger the status of the REMIC or cause any imposition of tax upon the REMIC.
>
> *****
> Under New York Trust Law, every sale, conveyance or other act of the trustee in
> contravention of the trust is void. EPTL 7-2.4. Therefore, the acceptance of the note and
> mortgage by the trustee after the date the trust closed would be void.
>
> *****
> The assignment of the note and mortgage from Option One rather from the Depositor
> ABFC violates section 2.01 of the PSA which requires that the Depositor deliver to and
> deposit the original note, mortgage and assignments to the Trustee.
>
> The assignment of the Defendant's note and mortgage, having not been assigned from the
> Depositor to the Trust, is therefore void as in being in contravention of the PSA."

In *Erobobo* the note was not endorsed in the manner required by the PSA, just as it was

not in the instant case. In *Erobobo* the assignment of the Note and Mortgage was after the

closing date just as it was in *Saldivar* and in the instant case. The trust in *Erobobo* was a

commercial REMIC trust governed by a PSA similar to *Saldivar* and the instant case. The Note

endorsement and the Assignment of the Note and Mortgage is void *ab initio* under New York

law in *Erobobo*, *Saldivar Glaski* and the instant case.

Since the Trustee did not accept the Mortgage Loan in the instant case properly

endorsed and assigned before the Closing Date pursuant to the requirements of the PSA, New

York Law and the PSA does not allow the Trustee to accept the Note and Mortgage in the instant

case thereafter. Pursuant to the United States Supreme Court decision in *Vandenbark,* this court

must apply *Erobobo* as the highest court decision in New York to determine New York law.

Under that case, Note and Mortgage assignments that do not comply with the PSA, as in the

instant case, are void *ab initio*, and the Trust does not have standing to foreclose.

The debtor is not asking the court to enforce her rights as a party to the PSA, but

simply to view the PSA and New York law as evidence that the endorsements, assignments and

transfers of the Note and Mortgage are void *ab initio* and that the Trust has no standing.

## **INJUNCTIVE RELIEF**

Defendant states in its motion to dismiss that plaintiff is not entitled to injunctive relief

because she has failed to establish in her adversary complaint that her remedy at law is inadequate or

that she is likely to succeed on the merits. Defendant cites an Illinois Supreme Court case, *Sadat v.*

*Am. Motors Corp.* (1984), 104 Ill. 2d 105, 470 NE2d 997 as requiring a complaint for injunctive

relief to include these allegations in order to be entitled to an injunction where a statutes general

grant of equitable relief does not evince congressional intent to dispense with the traditional

equitable pleading requirements. In *Sadat* the statute authorizing the equitable relief did not contain

an express statutory grant of authority to issue injunctions to enforce the statute, but rather a

generalized provision for civil actions afforded to consumers damaged by failure of a warrantor to

meet Magnuson-Moss warranty obligations.

*Sadat* however, cites a number of cases where plaintiff was not required to plead and prove

the traditional elements to obtain an injunction where injunctive relief was expressly authorized as a

means of enforcing compliance with the respective statute as in the instant case. *Sadat* distinguishes

the facts in its case from *United States v, Hayes International Corp.* (5th Cir. 1969), 415 F.2d 1038,

for instance, where the court concluded that it was not necessary to establish irreparable injury when

seeking an injunction pursuant to the statute in order to enforce the statute. In *Hayes* the court stated

as follows:

> "We take the position that ***irreparable injury should be presumed from the very fact that
> the statute has been violated. Whenever a qualified Negro employee is discriminatorily
> denied a chance to fill a position for which he is qualified and has the seniority to obtain, he
> suffers irreparable injury and so does the labor force of the country as a whole."

In the instant case, the statute, 225 ILCS 425/14(a) entitled "unlicensed practice"

expressly authorizes injunctive relief as a means of enforcing compliance with the statute as follows:

> "Sec. 14a. The practice as a collection agency by any entity not holding a valid
> and current license under this Act is declared to be inimical to the public welfare, to
> constitute a public nuisance, and to cause irreparable harm to the public welfare. The
> Director, the Attorney General, the State's Attorney of any county in the State, or **any
> person may maintain an action in the name of the People of the State of Illinois,
> and may apply for injunctive relief in any circuit court to enjoin such entity from
> engaging in such practice."**

Nothing more than has been pled by plaintiff needs to be pled in order for the court to enjoin

defendant from acting as a collection agent in Illinois without a license.

## NEGOTIABLE INSTRUMENT

In its response defendant states that its right to enforce the Note and Mortgage is

evident based on the face of the documents that serve as the basis for the Complaint. The Note

bears only one endorsement from Countrywide Home Loans, Inc., a New York Corporation

doing business as America's Wholesale Lender. The Note is not payable to Countrywide Home

Loans, Inc. In fact, except for the endorsement appearing only on the Note that is not certified as a true copy of the original, Countrywide Home Loans, Inc. is not mentioned anywhere in the Note. The Note is payable to America's Wholesale Lender which is a non-existant entity.

A "Doing Business As" or "d/b/a" name is only a trade name and as such, not a separate legal entity in Illinois. See *Burton v. Marriott International, Inc*. (2010), 2010 U.S. Dist. Lexis 86229, *Pekin Insurance Company v. Estate of Goben* (1999), 303 Ill. App. 3d 639.

America's Wholesale Lender is not a legal entity and cannot enforce the Note payable to it in Illinois.  America's Wholesale Lender is a mere nullity, not a natural person, corporation or partnership and cannot bring a suit to enforce the Note in Illinois. See *Alton Evening Telegraph v. Doak*, (1973), 11 Ill. App. 3d 381. A suit brought against a legally nonexistent party is void *ab initio*, *Theodorakakis d/b/a Father and Son New and Used Equipment v. Kogut* (1990), 194 Ill. App. 3d 586, *Lewis v. West Side Trust & Savings Bank* (1941), 377 Ill. 384. A proceeding by or against a mere fictitious name is a nullity, *Ohio Millers Mutual Insurance Co. v. Inter-Insurance Exchange of Illinois Automobile Club, 367 Ill. 44*.

810 ILCS 5/3-109(b) states that a promise or order that is not payable to bearer is payable to order if it is payable (i) to the order of an identified person or (ii) to an identified person or order. A promise or order that is payable to order is payable to the identified person. A negotiable instrument or endorsement made to a fictitious person cannot be treated as payable to bearer and negotiated without endorsement*, Keenan v. Blue*, 240 Ill. 177, 88 N.E. 553.

810 ILCS 5/3-104 defines a negotiable instrument in Illinois as an unconditional promise or order to pay a fixed amount of money, with or without interest or other charges described in the promise or order, if it is payable to bearer or to order at the time it is issued or first comes into possession of a holder. Since the Note is not payable to an identified person or bearer, but to

a non-existent entity, America's Wholesale Lender, the Note is not a negotiable instrument and
Article 3 does not apply.

When an instrument is made payable to one not in existence, the instrument is void and
no one can acquire any rights thereunder. *Bergman v. Avenue State Bank* (1936), 284 Ill. App.
516.

The Note is also not a negotiable instrument pursuant to 810 ILCS 5/3-104(a)(3), which
requires that the Note not state any other undertaking or instruction by the person promising or
ordering payment to do any act in addition to the payment of money.

The Note is full of instructions and promises other than the payment of the money advanced
under the Note, and the Note incorporates other promises and instructions from other documents,
which destroy the Note's negotiability.

Paragraph 4 of the Note instructs on the change dates of interest, the index used to
calculate the changes, the limits on interest rate changes, and notice of changes. All instructions
beyond the promise of payment of the money advanced.

Paragraph 5 instructs and by signature upon the Note contains the borrower's promise to
accept the terms of the borrower's right to prepay the loan, the terms under which she can prepay
the loan, what happens after prepayment and the paragraph contains instructions on partial and
full prepayments. These are all instructions and promises beyond the promise to pay the money
advanced.

Paragraph 6 instructs on what will happen if the lender collects illegal loan charges and
on how they will be returned to borrower. By signing the Note, the borrower promises to accept
those terms. These are instructions and promises beyond the promise to pay the money advanced.

Paragraph 7 includes borrower's promise to pay late fees; borrower's promise to pay the loan off in full after receiving a default notice from lender; instructs when such a notice may be sent; instructs borrower that lender is not waiving rights to accelerate in the future if he doesn't accelerate when borrower defaults; and borrower promises to pay Note holder's attorney's fees and expenses. These are all instructions and promises beyond the borrower's promise to pay the money advanced.

Paragraph 8 of the Note instructs the borrower on how notices are to be given and borrower, upon signing the Note, is promising to give notices to lender and accept notices from lender in the manner described in the paragraph.

Paragraph 9 of the Note incorporates all of the terms of all of the agreements outside of the note under which any person becomes a guarantor, surety or endorser of the Note by stating as follows:

> "Any person who takes over these obligations, including the obligations of a guarantor, surety or endorser of this Note, is also obligated to keep all of the promises made in this Note. The Note Holder may enforce its rights under the Note against each person individually or against all of us together."

This paragraph effectively makes the borrower promise to be jointly and severally liable under the Note with any future guarantor, surety or endorser of the Note. Certainly the agreements and promises those future guarantors, sureties and endorsers make and the documents, under which they make them, are incorporated into the Note by this paragraph. For instance in the PSA the Servicer guaranties the payments under the Note and Mortgage when it promises to pay the monthly payments of principal and interest and real estate taxes due under the Note and Mortgage to the trustee and the trustee agrees to pay the certificate holders even if the Mortgage is in default. If the borrower is to be jointly and severally liable with those entities under the Note, their payments apply to reduce the borrower's obligation to the Note Holder.

Paragraph 10 of the Note instructs the borrower on certain legal rights she has and then she promises to waive them.

Paragraph 11 of the Note does not just refer to the Mortgage, but effectively incorporates the terms of it as follows:

> "In addition to the protections given to the Note Holder under this Note, a Mortgage , Deed of Trust or Security Deed (the "Security Instrument"), dated the same date as this Note protects the Note Holder from possible losses which might result if I do not keep the promises I make in this Note. That Security Instrument describes how and under what conditions I may be required to make immediate payment in full of all amounts I owe under this Note."

In other words, to determine what may constitute a default and acceleration under the Note the borrower must look at the promises made in the Mortgage and the effect of defaulting on those promises as described only in the mortgage. Many of those promises have little to do with protecting the collateral and nothing to do with paying the money advanced. This language goes much farther than referring to the Mortgage securing the Note, but it incorporates all of the promises in the Mortgage, default of which will cause acceleration of the Note.

Paragraph 11 continues by stating some of the promises made by borrower in the mortgage that will result in acceleration if borrower defaults them. The paragraph also instructs borrower on what constitutes a transfer of property and requires borrower to promise to get lender's consent before transferring the property. These promises and instruction have nothing to do with the payment of the money advanced or protection of the collateral.

The Note is not a negotiable instrument and Article 3 of the UCC does not apply. Even if Article 3 did apply, 810 ILCS 5/1-302 allows the parties to an agreement to vary the statutory method of negotiation of the note by agreement as was done in the instant case pursuant to the PSA as follows:

> "Sec. 1-302. Variation by agreement.

(a)  Except as otherwise provided in subsection (b) or elsewhere in the
Uniform Commercial Code, the effect of provisions of the Uniform Commercial
Code may be varied by agreement."

In the PSA, the manner of negotiation of the Note was varied by agreement. In Section

2.01(g)(i) on page 58 of the PSA the parties to the PSA and ancillary documents agreed to

the method of negotiating the Note to the Trustee of the Trust in a manner different than

that required by 810 ILCS 5/3-201 as allowed by 810 ILCS 5/1-302 where the PSA

states as follows:

> "In connection with the transfer and assignment of each Mortgage Loan, the Depositor
> has delivered to, and deposited with, the Trustee
>
> *****
>
> the original Mortgage  Note, endorsed by manual or facsimile signature in blank
> in the following form: "Pay to the order of _____ without recourse",
> **with all intervening endorsements that show a complete chain of
> endorsement from the originator to the Person endorsing the Mortgage Note
> (each such endorsement being sufficient to transfer all right, title and interest
> of the party so endorsing, as noteholder or assignee thereof, in and to that
> Mortgage Note)"** (emphasis added).

The Depositor under the PSA is CWABS, Inc  (Depositor). The Note does not contain

any endorsement from America's Wholesale lender to anyone or from anyone to the Depositor or

from the Depositor to the Trust before  February 10, 2006, the Closing Date in the PSA (Closing

Date). As previously described in this response, failure of each of the sellers of the Note and

Mortgage to endorse the Note and deliver it to each buyer, including the Depositor and the Trust,

makes the negotiation of the Note to the Trust Void under New York trust law and the terms of

the PSA. See *Erobobo.*

Since the Note does not now bear the endorsements required by the PSA, it could not

possibly have borne those endorsements before the Closing Date in the PSA. Therefore, pursuant

to the PSA, New York trust law and *Erobobo*, the Trust has no interest in the Note and no

standing to lift the stay or foreclose. After the Closing Date, pursuant to the PSA, the trustee of

the Trust cannot accept the Note into the Trust even if the proper endorsements were made now.

The Trust can never own the Note or have standing to lift the stay and foreclose on plaintiff's

property.

Wherefore, the plaintiff requests that the court deny defendant's motion to dismiss,  and

grant plaintiff such other relief as the court deems just and equitable.

Respectfully submitted,

*/s/ Kenneth E. Kaiser*_____
Kenneth E. Kaiser, Attorney for Debtor

Kenneth E. Kaiser
 #1384090
502 N. Plum Grove Rd.
Palatine, IL  60067
(847) 991-6675